By the Court. Bosworth, J.
The letter of the 25th of June, 1846, instructed the defendants to make no disposition of the 5000 bbls. per “H". Biddle,” or of the 3000 bbls. per “ Georgianna,” until after receiving advice per “ Caledonia,” “ unless 22s. in bond is obtainable,” in which case, the defendants were authorized to sell, if they deemed it for the interest of the plaintiffs to accept that sum.
The letter of the 27th of June, was sent by the Caledonia, and received by the defendants on the 13th of July.
In the letter of the 27th of June, the plaintiffs say: " We fear *271 the first introductions for consumption may tend to continue low prices, as they will probably be large immediately on the passage of the new bill. Believing that after the stocks now in bond shall have been reduced by consumption, &c,, that an improvement may ensue, we express our desire that these parcels may be withheld from the market until the operation of the new law shall have produced its results”—* *. “ Though if 22s. in bond is obtainable on arrival, and you think our interest dictates such sale, please so to dispose of it.”
“ The new law” received the Royal assent on the 27th of June.
The N. Biddle arrived on the 18th of July, and 22s, in bond, was not then attainable.
Twenty-two shillings, in bond, was then equivalent to 25s. duty free, and that price was not then attainable.
The desire expressed in the letter of the 27th of June, was, that in such an event, these parcels should be “ withheld from the market” until the operation of the new law should have produced its results.
The flour was placed in the hands of Mr, Parker, as a broker, on or about the 21st of July. The N. Biddle arrived on the 18th of July. He offered it for sale, in the open market, and so sold it. Consequently it cannot be said to have been withheld from the market a single day, and the presumption is exceedingly strong, that it was put in market as soon as samples of it could be obtained, to be exhibited.
On the 18th of July, the day the flour arrived, the defendants wrote, that in two days they hoped to get a sample of the flour, and have it valued.
Assuming that samples were obtained within the anticipated time, the flour was put in charge of a broker for sale, as soon as he could be furnished with samples.
The discharging of it was commenced about the 27th of July. Discharging it at the rate of 1000 barrels a day, would require five days.
The jury found specially, that the defendants sold “ the 5,000 barrels of flour before the stock of grain, in bond, at the time the law referred to in the letter of the 27th of June, had been introduced into the market, and had been reduced by consumption.”
The jury were charged that the defendants were bound, by *272 their instructions, at all events, to withhold the flour from the market until the stock, in bond, on the passage of the corn law, had been reduced by consumption, &c. Until it had been reduced by consumption, &c., the time would not arrive at which, nor the contingencies have happened on which the contemplated results would have been produced, and could be ascertained.
“ But it was both the right and the duty of the defendants, in the exercise of good faith, and proper care and diligence, to determine, after the stock in bond had been introduced into the market, and had been reduced by consumption, &c., whether, and when the law had produced its results within the proper meaning of the word, ‘results,’ as I have explained it—and also to determine, thereupon, when their duty and the interests of the plaintiffs required them to sell, acting under such instructions.” “ If, in selling at the time they did, they sold before the stock, in bond, had been introduced into the market, and had been reduced by consumption, &c., they sold before they were authorized to sell, and are liable for the consequences of that act.”
“ If they did not sell until after these two events had occurred, they are not liable, unless they failed to exercise that care and diligence which a prudent consignee, acting on his own account, and with the knowledge or information which the evidence shows they possessed, would have exercised.”
Whether the Judge, in submitting the question, in answer to which the jury found the particular facts, above quoted, expressed any views, as to what must be understood by the words, “reduced , by consumption,” &c., the case does not disclose.
Those views, if any were stated, must be deemed to have been satisfactory to both parties. If it is to be assumed, that none were stated, then it is to be observed, that it does not appear that either party desired any particular instruction on that point, and that that matter was treated as one in respect to which the expe-. rience and intelligence of the jury required no aid from the Court.
We think this part of the case was submitted to the jury in a form as favorable to the defendants as they had a right to ask, if there was evidence which warranted any submission of the questions of fact, on which, they passed and rendered their verdict,
*273 The flour was sold on. the 4th, 5th, and 7th of August, at 21s., duty free, except 100 bbls., which were sold at 21s. 6d.
There is evidence enough to justify a jury in finding, that, from the 18th of July, when the flour arrived, until about the middle of August, the prices were rather declining, and that there was no sensible diminution of the stock in the market.
s.d.tos.d.
Defendts’ letter of July 3d, 1854, quotes N. Orleans at 24 -25
ft tt tt “ 18, it tt tt ft 23 -25 tt tt tt Aug. 3, tt tt ft ft 22 -24 u it tt “ 18, ÍÍ tt ft ft 23 -25 it tt tt Sept. 3, it tt ft ft 23.6-25 tt tt it “ 11, tt tt tt tt 26 -27.6 tt tt tt Oct. 3, it it ft tt 28.6-29 tt tt tt “ 19, it ft tt tt 33 -34
John Parke says, the highest price obtainable for New Orleans flour, in bond, between the 15th of June and the end of July, 1846, was 20s. and duty paid, was 28s. The prices were declining a little between the 18th of July and the 10th of August.
John Harnett says, the highest price, between the 15th of June and the 31st of July, 1846, was on the 14th of July; and then, duty paid, it was 22s. The price of such flour, immediately on the passage of the act, duty paid, was between 21s. and 22s. '
John Francis Godwin says, the highest price obtainable for such flour, between the 15th of June and the end of July, 1846, in bond, was 22s., and he thinks this was at the end of June. The prices, from the 18th of July to the 10th of August, were constantly declining.
The jury might very well find that an improvement of prices had not commenced, between the passage of the Corn Law and the sale of the flour; that as soon as samples could be procured, and about the 21st of July, the 5000 bbls. were put into the market, to be sold, by a broker; that the discharging of the flour was not begun till about the 27th of July; and that it was sold about as soon as it was placed in store, the sales being on the 4th, 5th, and 7th of August.
The jury might also have found, on the evidence, and properly too, that there had been no such reduction, by consumption, &c., as to effect an improvement of prices, or as would furnish any *274 basis for judging that such anticipated improvement was not morally certain to result. ,
On the 3d of July over two millions of quarters, of wheat and flour together, had been cleared at the Custom House, at the minimum duty.
Up to the 18th of July, “the.importations of foreign grain and flour had been large, and dealers were disinclined to buy, except for immediate use, and prices were further depressed.”
Mr. Harnett says, the quantity of stock of foreign grain in the United Kingdom, from the 18th of July, 1846,-to the 10th of August following, was unprecedentedly large—never so large before, in his recollection. There was about a million and a half barrels of flour, and about two millions to two millions and a half of wheat in the United Kingdom.
We cannot doubt that there was sufficient evidence of a violation of instructions to call for the submission of that question, as a question of fact, to the jury, and that the jury have determined it against the defendants, on evidence which warrants their verdict.
The jury were also instructed, that, if before the change had occurred in the market, of which the defendants spoke in their letter of the 18th of August, the stock in bond had been introduced into the market and had been reduced by consumption, and thereupon the defendants, in the exercise .of good-faith and proper care and diligence, had determined, or might fairly determine, that the law had produced its results, as the word “results” had been explained to them, they were not liable for selling at the time they did.
The jury were then advised, if the defendants could not rightfully have sold before the change in the market alluded to in that letter had commenced, by what legal rules they should be governed, in determining when the defendants might justifiably have sold.
On the 12th of August, they had received the plaintiffs’ letter of the 31st of July. The jury were instructed, that the defendants, in order to discharge their duty to the plaintiffs, properly, under the instructions given to them by that letter, “ were' bound to exercise good faith and reasonable care and diligence; such care and diligence as a consignee of ordinary care and prudence, *275 not coerced by any necessity to sell, and acting on his own account, would have exercised under such circumstances.”
And if they found against the defendants, on the question of a proper performance of duty, “ they would look at all the evidence bearing upon the question, at what time the market prices of flour began to advance, what continued to be the tendency of prices, and what must have been the views of men of prudence having such information as the defendants had, acting with reasonable care and diligence, as to the time when the flour might have been sold without justly incurring the imputation of having acted without reasonable care and diligence.
“ When you shall have fixed that time, upon a careful consideration of all the evidence before you, you will determine what price the defendants could have obtained for it then, in selling it in the usual mode, and in the exercise of proper care and diligence.
“ With that price you will charge them,” &c.
It was urged, with much ability, that if the jury should answer the first special question in the affirmative, an affirmative answer to the second would follow as a matter of course—as a mere sequence to the first answer.
We do not think that this conclusion is necessarily correct, nor necessarily a reasonable one.
The jury may not have found, or intended to find, any intentional bad faith on the part of the defendants.
And they may have considered, that although the defendants had concluded that the events had occurred which left them at liberty to judge whether the new law had produced its results, and before selling, had judged that the law had produced its results, and that therefore they could properly sell; yet, even under that favorable view for the defendants, in selling at the time they did, they failed to exercise that care and diligence which prudent consignees, having the information which the defendants then had, and acting on their own account, would have exercised.
Hence they may have been of the opinion that whether that view was taken of the case, or whether the conduct of the defendants, as factors, not absolutely prohibited from selling, but authorized to sell, if they had concluded, on a fair exercise *276 of care and diligence and of their judgment formed on the information which the evidence showed they possessed, • that the interests of the plaintiffs required such a sale as was made—that there was a negligent and careless performance by them of these duties, for the consequences of which they should respond to the plaintiffs.
We think that the case was submitted to the jury as favorably, at least, as the facts of the case justified.
By the letter of the 27th of June, the defendants were not at liberty to sell, oh arrival, unless 22s. in bond could be then obtained—that was equal to 25s. duty free.
The “N. Biddle” cargo reached Liverpool on the 18th of July. That was the day of its arrival there. A sale of it was forbidden unless, on “ arrival,” 25s. duty free could be obtained.
If that price could not then be obtained, the defendants were required to withhold the flour “from the market,” for a period thence to ensue, and until certain contemplated results, particularly stated in the letter of the 27th of June, as anticipated by the plaintiffs, should have been produced, or ascertained.
The defendants, when prohibited from selling on arrival at less than 22s. in bond, could not immediately take the flour out of bond, and sell it for a price which would not be equivalent to 22s. in bond.
But instead of withholding it from the market, it was placed in the hands of a broker to be offered in the market as soon as samples of it could be procured, and before the discharging of the cargo from the vessel had been commenced. Actual sales commenced about, if not quite as soon as the whole cargo was discharged. It was sold, after the defendants,, by their circular accompanying their letter of the 3d of August, or by the letter itself, had informed the plaintiffs that the weather for the then “last two or three days have been unsettled,” and that “Indian corn has been in much better demand, in consequence of the accounts from Ireland of the potato crop being very alarming.”
This sale, the defendants, in their letter of the 18th of August, said they regretted, “ as on the 11th or 12th inst. (August) a great change for the worse took place in the weather, and the potato crop was completely blighted.” The circular forming part of that letter states that “ the bulk of the new wheat will be *277 of poor quality, and in indifferent if not in bad condition, owing to the wet weather which has prevailed during the last fortnight.” New Orleans flour had then advanced “ 2s. per barrel, with every prospect of a further advance,” and they also wrote, “ we accordingly hold your 3,000 barrels, ex ' Greorgianna,’ in the hope of better prices, in which we trust we shall not be disappointed.”
This was written after the plaintiff’s letter of the 31st of July had been received, which confided the matter of selling entirely to the discretion of the defendants. (That was received on the 12th of August.) I say that letter confided the matter of selling entirely to the discretion of the defendants. It was so construed in the charge to the jury.
But that discretion was given on the supposition, as expressed in that letter, that, ere then, “ the crop of wheat has been ascertained, as to its probable yield, and the grain and flour conformed to such result.”
That supposition was erroneous. The letter of the 3rd of August, written before any flour was sold, stated that causes were then operating, and of so marked a character that they excited public attention, and which by the 12th of August had produced a marked advance in the market, and a general conviction of a still further advance, in consequence of their effects on the quality as well as probable yield of the crop of wheat of that season.
These facts, are quite conclusive to show, that the instructions to withhold the 5,000 bbls. from the market, were disobeyed, or entirely disregarded, and that no attention was paid to the limitation as to price, which the defendants were required to obtain, as a condition to the right to sell, and that the sale was made while prices had a downward tendency, and when they had reached the lowest point, while the flour sent by the “ Greorgianna,” and covered by the same instructions, was withheld from the market.
Why one cargo should have been immediately put in the market, and sold, and the other withheld, and why the larger instead of the smaller cargo should have been sold, it is difficult to conjecture, unless it was the intention of the defendants, in placing samples in the hands of a broker, merely to have the *278 quality and value ascertained, while the broker, on the contrary, acted on the assumption and belief that he was authorized and expected to sell, and having sold, the defendants deemed it best or found it necessary, to complete the sale.
The evidence that, the defendants disobeyed the instructions which they received from the plaintiffs, seems to us to be very strong, and the conclusion most favorable to the defendants is, that such disobedience resulted from a want of, or a failure, on their part, to exercise, that reasonable care and diligence which was essential to a proper performance of their duty, as factors.
The defendants also complain of the construction given at the trial, to the letter of the 27th of June.
The language of that letter is: “We fear the first introductions for consumption may tend to continue low prices, as they will, probably, be large, immediately on the passage of the new bill. Believing that after the stocks, now in bond, shall have been reduced by consumption, &c., that an improvement may ensue, we would express our desire that these parcels should be withheld from the market until the operation of the new law shah have produced its results.”
The plaintiffs, doubtless, expected that the importations would be large, in anticipation of the passage of the new law, and that they would be released from bond, by the owners or consignees, availing themselves of the opportunity of releasing it, by paying the minimum duty, immediately on the passage of the law.
Parke testifies that, “ the stock in bond, previous to the passing of the Corn Law, was large, in consequence of its accumulating, in anticipation of the reduction of duty.”
Harnett testifies to the same thing.
The circular to defendants’ letter of the 3d of July, states that “ the whole stock of foreign grain and flour in this port, and throughout the kingdom, upwards of two millions of quarters of wheat and flour together, has been cleared, at the Custom House, at the minimum duty, viz. 2s. 5d.”
The charge was, that “ the obvious meaning of these instructions is, that these parcels were to be withheld from the market, until the operation of the new law should have produced its results in view of the effect produced, as well by a reduction of the stock then in bond by consumption, &c., as by the intro *279 duction of large quantities into the market by means of the duty being diminished."
“ The question is whether they sold without waiting until the operation of the new law had produced its results, in the sense which I have stated; or to express my views more clearly, without waiting, until the defendants in the exercise of fair diligence and good faith might have supposed and believed upon the information which the evidence shows they had, that such results had been ascertained.”
“ The defendants were to judge, when the new law should have produced its results, within the meaning of the word ' results,’ as used in that letter.
“ They were bound, at all events, to withhold the flour from the market, until the stock in bond had been reduced by consumption,” &c.
“ If, in selling at the time they did, they sold before the stock in bond had been introduced into the market, and had been reduced by consumption, &c., they sold before they were authorized to sell, and are liable for the consequences.
“ If they did not sell until after these two events had occurred, they are not liable, unless they failed to exercise that care,” &c.
There can be no pretence, as we think, that the jury could have understood from this charge, that the defendants were bound to wait, before exercising their judgment, whether the law had produced its results, until importations should have been introduced into the market, other than those in bond, at the time of its passage.
They were expressly charged, that if the defendants did not sell before the stock in bond had been introduced into the market, and had been reduced by consumption, &c.,” “they were not liable,” unless guilty of a neglect of duty, by reason of their failing to exercise proper care and diligence.
It is also objected, in the points, that “this part of the charge is vague and indefinite, and, in effect, left it to the jury, to fill in under the ' &c.,’ whatever their fancy might have suggested.”
We think that the use, in the charge, of these words from the letter, presented the case more favorably for the defendants than it would have been by the omission of the “ &c.”
The result which it was anticipated would improve prices, *280 was a “reduction.” of the quantity in bond, after it had been introduced into the market, by its consumption, or other causes, in addition, which should prevent its being capable of being sold in the market for human food.
Whatever causes, other than actual consumption, under the evidence, the jury might think had produced such results, and which they might fill in under the “ &c.,” was beneficial to the defendants, in the process of finding an early day, at which they would be justified in selling.
But the charge was not excepted to, at the trial, on account oi the use of the “ &c.,” or on account of its vagueness.
The defendants object that the pleadings do not warrant a recovery, either on the ground of fraud, or of negligence, or of a want of skill.
The pleadings were drawn before the Code was enacted.
The act of April 11th, 1849, applied sections 169 to 176, inclusive, of the Code, to future proceedings in civil actions, which were pending on the 1st of July, 1848. (Laws of 1849, p. 705, § 2, Sub. 1.)
By § 169, no variance between the allegation in a declaration, and the proof, can be deemed material, unless it shall have actually misled the defendant, to his prejudice, in maintaining his defence.
If a defendant alleges he has been misled, he must prove that fact to the satisfaction of the Court, and in what respect he has been misled. (id.)—Catlin v. Gunter, 1 Kern. 368,373; Harmony v. Bingham, 1 Duer, 209-210.
The 2d count states, the receipt of the flour, to be sold by the defendants, as factors and agents; their duty to obey orders, and their promise to perform their duty as factors; a disregard of their promise; and that, “ contriving and intending to deceive and defraud the plaintiffs in this behalf, and contrary to their duty as factors, and contrary to the orders of the said plaintiffs, in this behalf, given to and received by the defendants, and carelessly, and negligently, and inattentively, sold the said merchandise prematurely, and for low and insufficient prices, and for less than they might and could have obtained therefor, if they had well, faithfully, and diligently performed and fulfilled their duty, as factors of the plaintiffs in this behalf; and thereby the plaintiffs lost the differ *281 ence in. price which they would have received, if the defendants had properly conducted themselves in this behalf, which difference in price amounts to a large sum of money, to wit, twenty thousand dollars.”
The breach, of the duty and promise stated, is alleged, in this count, to consist of the careless, negligent, and inattentive manner in which the defendants acted, in selling the flour. It is also alleged, that damage ensued, to which the plaintiffs would not have been subjected, if the defendants had faithfully and diligently performed their duty, as factors of the plaintiffs in this behalf.
We think that this is, in substance, the matter submitted to the jury, by the second question, which they answered in writing.
Even if the first special instruction, which the defendants requested should be given to the jury, was proper in the absolute and unqualified form in which it was stated, it is not easy to perceive why the second special question might not properly have been submitted to the jury, if there was evidence to justify the submission of the inquiry it embraced, as a question of fact.
We do not think that any error was committed, to the prejudice of the defendants, either in the charge to the jury, or in the admission of evidence, and that the judgment should be affirmed.